UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| In re ) | |
| ) | |
| M. DAVIS MANAGEMENT, INC., ) | Case No. 6:09-bk-02071-KSJ |
| ) | Chapter 11 |
| Debtor. ) | |
| ) | |
| M. DAVIS MANAGEMENT, INC., ) | |
| ) | |
| Plaintiff, ) | Adversary No. 6:10-ap-00237-KSJ |
| vs. ) | |
| ) | |
| DENNIS ZINK AND MICHELE ZINK, ) | |
| ) | |
| Defendants. ) | |
| ) | |

**MEMORANDUM OPINION PARTIALLY GRANTING
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND
DENYING DEFENDANTS' MOTION FOR SUMMARYJUDGMENT**

The plaintiff in this adversary proceeding, reorganized debtor M. Davis Management, Inc., seeks to avoid pre-petition transfers of over $1 million from the pre-bankruptcy company to its former vice president, director, and CEO, Dennis Zink, and his wife, majority (51%) shareholder and company president, Michele Zink. The company made most of the contested transfers to Mr. Zink pursuant to numerous monthly service contracts the reorganized debtor argues were a sham device the Zinks used to take equity out of the company at a time when company revenues and profits were declining. The debtor argues both that the company (controlled by the Zinks) made the transfers to Mr. Zink with actual fraudulent intent and that the transfers were constructively fraudulent.[1]

---

[1] Counts I and III of the debtor's complaint (Doc. No. 1) are actual fraudulent transfer avoidance actions premised under § 544(b), 548(a)(1)(A), and 550 of the Bankruptcy Code and comparable Florida Statutes § 726.105(1)(a), 726.106 and 726.108, respectively. Counts II and IV are constructive fraudulent transfer actions brought under § 544(b), 548(a)(1)(B), and 550 of the Bankruptcy Code and Fla. Stats. § 726.105(1)(b), 726.106 and 726.108, respectively. Count V of the debtor's complaint is an action for director liability under Fla. Stat. § 607.

Both parties now move for partial or final summary judgment on numerous grounds.[2] Because the reorganized debtor has provided extensive evidence of the company's actual and constructive fraudulent intent in making the transfers to *Dennis* Zink, the Court grants partial summary judgment in favor of the reorganized debtor on Counts I, II, and III as to such transfers. The Court denies all other relief requested by either party because (i) as to Count IV, the Court's ruling on the constructive fraudulent transfer issue relies upon a unique subsection of the Bankruptcy Code (§ 548(a)(1)(B)(ii)(IV)) not included in the comparable Florida Statutes, (ii) material issues of disputed fact exist as to whether the transfers to *Michele* Zink were made with actual or constructive fraudulent intent, and (iii) the Zinks have not shown any basis entitling them to summary judgment.

This dispute is rooted in a contentious shareholder contest between the Zinks and Faith Fairbrother, the debtor's only other (49%) shareholder, and the debtor's former director, sales manager, and vice president. After a falling out between the Zinks and Fairbrother, she abruptly resigned from the company in June 2007 but retained her shares of company stock and, significantly, all rights arising under the equity agreements between the parties. The company, now under the control of the Zinks, immediately sued Fairbrother in Florida state court seeking injunctive relief and damages on numerous causes of action, including breach of restrictive

---

[2] See Plaintiff's Motion for Summary Judgment (Doc. No. 22); Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment (Doc. No. 31) and supporting declarations of Dennis Zink (Doc. No. 32) and Samuel A. Miller (Doc. No. 33); and Plaintiff's Reply to Defendants' Opposition (Doc. No. 34). On April 18, 2011, defendants filed their own Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment as to Count V (Doc. 35). The Court held a hearing on April 20, 2011. On May 9, 2011, the Court issued an order setting a briefing schedule as to defendants' motion (Doc. No. 40), and the plaintiff in response filed its Opposition to Defendants' Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment as to Count V (Doc. No. 43). Lastly, defendants filed a reply (Doc. No. 48).

covenants and breach of contract.[3] Fairbrother countersued the company and the Zinks, seeking, among other things, unpaid wages and damages for breach of contract.[4]

The company's financial health deteriorated quickly and considerably after Fairbrother's departure. From 2004 to 2006, the debtor reported annual revenues ranging from $3.1 million to $3.6 million and operating annual income from $0.9 to $1.4 million.[5] By 2008, the company's revenues were down to $2.1 million, and the company experienced an operating loss of approximately $200,000.[6] The company filed this bankruptcy case on February 24, 2009.

Despite the company's decline in revenues, the Zinks maintained their historical level of compensation, though with a twist that is the crux of this case. Immediately upon Fairbrother's departure, the Zinks began paying Dennis Zink as a contract employee and stopped making equity distributions to Michele Zink and, of course, Fairbrother. The purpose of this arrangement was for no other reason than to skirt a provision in the parties' Equity Participation Agreement, dated January 22, 1998, that entitled Fairbrother to "be paid the same amount" of all "available cash flow derived from profits…after leaving enough funding for the company to pay all of its timely obligations."[7] In other words, under the Agreement, the Zinks could not receive distributions without making equal distributions to Fairbrother. The Zinks refused to honor the Agreement, however, wanting to maintain their pre-June 2007 income, the majority of which was comprised of approximately $595,000 per year in equity distributions previously paid to Michele Zink.

Determined not to pay a dime to Fairbrother yet simultaneously to maintain their prior income level, the Zinks instead started to pay Dennis as a "contract employee," in a disingenuous

---

[3] Case No. 07-CA-10183, styled *M. Davis Management, Inc. v. Faith Fairbrother v. M. Davis Management, Inc., Dennis Zink, and Michele Zink*, filed in the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida.
[4] See Fairbrother's Amended Proof of Claim no. 13-2 that attaches her answer and countersuit filed in the state court case.
[5] Report of Robert B. Morrison, October 27, 2009 (Doc. No. 138) (the "Examiner's Report"), ¶ 8.
[6] *Id*. at ¶ 10.
[7] Doc. No. 22, Ex. G, ¶ 1.A.

attempt to avoid the restrictions of the Equity Participation Agreement. To do this, the company began "hiring" Dennis under monthly service contracts at between $19,250 and $19,990.[8] The contracts were made for the following purported services: competitive bidding, accreditation, sales management, managed care, website design, or year-end financial reporting. Mr. Zink and the company entered into multiple services contracts each and every month, sometimes entering into as many as four service contracts in one month. Indeed, in January and February of 2008, Mr. Zink received approximately $79,000 *each month* for the services he purportedly provided under four separate service contracts that paid him approximately $19,500 on average.[9]

The nearly identical dollar amounts Mr. Zink received under each contract can be explained by two things. First, the dollar amount of every contract—$19,250 to $19,990—falls *just* shy of the $20,000 amount above which any material contract entered into by the company must be unanimously approved by all three directors (i.e. the Zinks and Fairbrother) under the terms of the Equity Participation Agreement.[10] Second, the primary goal of the contracts was to serve as a substitute for the Zinks' historical average annual compensation. The numerous monthly service contracts allowed them to receive amounts comparable to their historical equity draws while appearing to follow the restrictions of the Equity Participation Agreement requiring equal distributions to Fairbrother. Indeed, Mr. Zink previously has admitted in testimony before this Court that the amount he received under the contracts was merely a rough approximation of the couple's combined annualized earnings between 2003-2006 which consisted of equity distributions to Michele and salary paid to both Michele and Dennis.[11]

The fact that the service contracts were an equity substitute is convincingly shown by the amounts the Zinks received before and after Fairbrother's departure. For the time period

---

[8] Ex. K to Doc. No. 22.
[9] Doc. No. 22, Ex. L (providing a summary chart of Mr. Zink's earnings under the service contracts).
[10] Doc. No. 22, Ex. G, ¶ F.6.
[11] See testimony of Mr. Zink on August 24, 2009, pgs 86-89, attached as Ex. B to Doc. No. 22.

between January 2004 and May 2007, before Fairbrother resigned, Michele Zink received annual distributions from the company of approximately $595,000 and an annual salary of approximately $120,000, while Dennis Zink received $65,000 per year in salary.[12] After Fairbrother's resignation, from June 2007 to the petition date of February 24, 2009, Michele Zink received her usual salary, but received *no* distributions, while Mr. Zink received approximately $1,030,241 pursuant to monthly service contracts.[13] In 2008 alone, Mr. Zink received $663,008, a huge increase from his prior annual salary of $65,000.[14] Meanwhile, Fairbrother, the 49% shareholder, received nothing.

The Zink's scheme to maintain their income stream while freezing out Fairbrother caused substantial harm to the company. Mr. Zink's excessive post-2007 compensation placed a significant burden on the company's finances. In 2008, Mr. Zink received a total of $663,008 out of the company's gross receipts totaling $1,757,000, or approximately 34% of the company's earnings.[15] The burden to the company that year is evidenced by the company's $200,000 net operating loss.[16] As the report of examiner Robert B. Morrison, dated October 27, 2009, stated, "excess compensation by the officers of the company" "could challenge [the company's future financial] viability."[17] The Zinks, in other words, paid Dennis Zink an extraordinary amount of compensation based entirely on their historical annual equity draws at a time when the company's revenues were declining, and the company had a limited capacity to make equity distributions to shareholders.

---

[12] Testimony of Mr. Zink on August 24, 2009, pgs. 179-80, attached as Ex. B to Doc. No. 22. Plaintiff alleges Mr. Zink's $65,000/year salary was paid to Mrs. Zink for various reasons, but the Court lacks enough evidence to determine the truth or falsity of this allegation.
[13] Doc. No. 22, p. 10.
[14] Fairbrother's Exhibits 1a and 1b, admitted into evidence on August 24, 2009 (Doc. No. 95 in the Main Case; Ex. H to Doc. No. 22 in this adversary proceeding).
[15] Testimony of Mr. Zink, February 5, 2009, in civil case no. 07-CA-10183, Ex. M. to Doc. No. 22.
[16] *Examiner's Report*, ¶ 10 (Doc. No. 22, Ex. D; and Doc. No. 138 in the Main Case).
[17] *Examiner's Report*, ¶ 14.a.

Given these facts, the primary issue in this adversary proceeding is whether the company—controlled by the Zinks—made the transfers to Mr. Zink with actual or constructive fraudulent intent. The debtor has moved for summary judgment on both fraudulent transfer theories, relying heavily on the Zinks' previous testimony before this Court on separate matters.[18] The Zinks have responded by arguing that summary judgment is premature, that material issues of fact preclude summary judgment, and also by filing their own motion for summary judgment on four separate issues. The Zinks seek final summary judgment arguing: (1) the debtor lacks standing to pursue this adversary proceeding because there is no benefit to the estate as required by § 550 of the Bankruptcy Code; (2) the debtor lacks standing to pursue its director liability claim under Fla. Stats. § 607 (Count V); (3) the debtor has no authority to pursue Count V under the terms of the order confirming the debtor's amended plan (the "Confirmation Order")[19] or the amended plan of reorganization (the "Plan");[20] and (4) the Plan and Disclosure Statement failed to adequately disclose a potential director liability cause of action against the Zinks.

Under Federal Rule of Civil Procedure 56, made applicable by Federal Rule of Bankruptcy Procedure 7056, a court may grant summary judgment where "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."[21] The moving party has the burden of establishing the right to summary judgment.[22] However, under Rule 56(e), the nonmoving party, in responding to a properly made motion for summary judgment, "may not rely merely on allegations or denials in its own pleadings; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts

---

[18] This Court heard testimony of the Zinks and others at evidentiary hearings held on April 2, August 24, and August 31, 2009, the transcripts of which can be found at Main Case Doc. Nos. 66, 148, and 149, respectively.
[19] Doc. No. 265.
[20] Doc. No. 250.
[21] Fed. R. Civ. P. 56.
[22] *Fitzpatrick v. Schlitz (In re Schlitz)*, 97 B.R. 671, 672 (Bankr. N.D. Ga. 1986).

showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party." Conclusory allegations by either party, without specific supporting facts, have no probative value.[23]

In determining entitlement to summary judgment, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."[24] "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."[25] A material factual dispute precludes summary judgment.[26]

## The Zinks directed the Company to pay Dennis Zink over $1 million with actual fraudulent intent (Counts I and III).

The Court agrees with the reorganized debtor that the pre-bankruptcy company's actual fraudulent intent is conclusively established as to the $1,030,241 transferred to Dennis Zink between June 6, 2007, and the petition date, February 24, 2009. A party moving for summary judgment under § 548(a)(1)(A) and comparable Florida Statutes has the burden to show that (1) the company "transferred an interest in property," and (2) the transfer was made "with actual intent to hinder, delay or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted."[27] Given the difficulties in establishing a transferor's actual intent, courts generally look at the totality of the circumstance and the badges of fraud surrounding the transfers to establish the requisite intent.[28]

---

[23] *Evers v. General Motors Corp.* 770 F.2d 984, 986 (11th Cir. 1985).
[24] *Scott v. Harris*, 550 U.S. 372, 380 (2007).
[25] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).
[26] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).
[27] *In re Evergreen Security, Ltd.*, 319 B.R. 245, 252 (Bankr. M.D. Fla. 2003).
[28] *In re World Vision Entertainment, Inc.*, 275 B.R. 641, 656 (Bankr. M.D. Fla. 2002). Badges of fraud include, but are not limited to, whether: (1) the transfer was to an insider; (2) the debtor retained possession or control of the property after the transfer; (3) the transfer was concealed; (4) before the transfer was made the debtor had been sued or threatened with suit; (5) the transfer was of substantially all of the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor transferred the essential assets of the business to a lienor who transferred the asset to an insider of the debtor. *Dionne v. Keating (In re XYZ Options, Inc.)*, 154 F.3d 1262, 1272 (11th Cir. 1998).

Three primary facts establish that the company, acting under the Zinks' control, acted with fraudulent intent in making the transfers to Dennis Zink. First, the Court finds the *only* purpose of the service contracts was to avoid paying any distributions or other compensation to Fairbrother, who is a creditor in this bankruptcy case[29] and was then a 49% shareholder and former employee of the company countersuing the company for unpaid wages. By the Zinks' own admission, the amounts paid under the service contracts bore *no* relation to Dennis Zinks' actual services, but instead were nearly a dollar for dollar substitute for the amount of equity distributions they had received in the past. The Zinks knew Fairbrother was contractually entitled to a distribution equal to whatever distribution they received. So they tried to "freeze" her out by paying Mr. Zink as a contract employee. As this Court has previously remarked, doing so was just plain wrong,[30] and it is strong evidence of the Zinks' and, by extension, the company's actual intent to hinder, delay, or defraud Fairbrother.

Second, the substantial amounts transferred to Dennis Zink at a time when the company's revenues were declining dramatically also indicate fraudulent intent. As noted above, the Examiner's Report stated "excess compensation by the officers of the company" "could challenge [the company's future financial] viability."[31] The burden to the company of Mr. Zink's compensation is evidenced by the company's $200,000 net operating loss for 2008 and the fact that Mr. Zink's compensation comprised 34% of the company's earnings.[32] The Zinks knew the company was struggling, yet continued to pay Dennis Zink extraordinary sums based on their historical equity distributions during more profitable years. The company's intent in

---

[29] Fairbrother filed a proof of claim (No. 13) on June 19, 2009, in the amount of $1,352,334.82, based on her counterclaims pending against the company in state court. Under § 502 of the Bankruptcy Code, a "claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest…objects." There is no pending objection to Fairbrother's claim, as the Chapter 11 trustee withdrew his objection to claim in open court on September 1, 2010 (Doc. No. 279). Therefore, Fairbrother holds an allowed claim.

[30] Transcript of hearing on August 31, 2009, p. 181-185.

[31] *Examiner's Report*, ¶ 14.a.

[32] Testimony of Mr. Zink, February 5, 2009, in civil case no. 07-CA-10183, Sr., Ex. M. to Doc. No. 22.

paying Mr. Zink was not to compensate him for his services, but to drain the company of cash in advance of paying other legitimate claims with the actual intent to hinder, delay, or defraud the company's creditors. The insiders operating the company simply wanted to empty the corporate coffers in advance of other creditors, particularly Fairbrother.

Third, the transfers were made to a company insider who also completely controlled the company. At the time of the transfers, Dennis Zink was the vice president and CEO of the company and Michele Zink was the president and majority shareholder. The Zinks had complete control over company financial decisions, limited only by the Equity Participation Agreement with Fairbrother, which they intentionally subverted. Dennis Zink signed the checks on behalf of the company to pay himself, and Michele Zink signed each and every faux "service contract."[33] The Zinks, and *only* the Zinks, determined to pay Dennis Zink unreasonably high amounts while they both knew or should have known that the company's revenues were declining, that Fairbrother was entitled to equity distributions, and that Fairbrother was suing the company for unpaid compensation (among other things).

The Zinks, significantly, have not rebutted the factual allegations in the reorganized debtor's summary judgment motion, arguing summary judgment is premature because they have not had the opportunity to conduct meaningful discovery. This adversary proceeding was filed on September 29, 2010. The Zinks filed their response in opposition to summary judgment on March 30, 2011. They have had ample time to conduct sufficient discovery to meet the minimal burden of proof required to rebut a motion for summary judgment, particularly when they were the very persons in charge of making the challenged distributions to Dennis Zink. Under Rule 56(c), the Zinks need merely to assert that a fact is genuinely disputed and to support the allegation with some particular materials in the record. They have not successfully done this, and summary judgment is accordingly appropriate in favor of the reorganized debtor.

---

[33] Ex. K to Doc. No. 22.

In sum, the uncontested facts show the company, controlled entirely by the Zinks, made the transfers to Dennis Zink with the actual intent to hinder, delay, or defraud the company's creditors—primarily Fairbrother. The Court grants summary judgment in favor of the reorganized debtor on Counts I and III as to the transfers from the company to Dennis Zink pursuant to the service contracts totaling $1,030,241.

The plaintiff, however, has failed to demonstrate that the continued salary paid to Michele Zink was inconsistent with the company's prior practices, outside the ordinary course of the company's business, or made with actual fraudulent intent. Because factual issues remain as to the transfers from the company to Mrs. Zink, the Court will deny summary judgment on Counts I and III as to any such transfers she received.

### The company made transfers to Dennis Zink with constructive fraudulent intent under Bankruptcy Code § 548(a)(1)(B) (Count II).

The Court also agrees with the reorganized debtor that, as to monies received by Dennis Zink, no genuine issues of material fact preclude summary judgment in favor of the reorganized debtor on the constructive fraudulent transfer claims raised under § 548(a)(1)(B) of the Bankruptcy Code (Count II). Section 548(a)(1)(B) of the Bankruptcy Code provides that a transfer is constructively fraudulent where: (1) the debtor "transferred an interest in property;" (2) the debtor received "less than a reasonably equivalent value" in exchange for such transfer; and (3)(i) was insolvent on the date that such transfer was made or such obligation was incurred, (ii) was engaged in business with an unreasonably small amount of capital, (iii) intended to incur debts beyond the debtors' ability to pay such debts, or (iv) made such transfer to or for the benefit of an insider of the debtors under an employment contract outside of the ordinary course of business.[34]

---

[34] Bankruptcy Code § 548(a)(1)(B).

Applying this test to these undisputed facts, the company transferred $1,030,241 to Dennis Zink in the 22-month prepetition period. Dennis Zink's own testimony establishes that the transfers were made for less than reasonably equivalent value. He previously has testified that the *sole* basis for the amounts he received under the service contracts was the Zinks' annualized historical earnings and equity distributions, *not* the value of the services he provided to the company. Before Fairbrother left the company, Dennis Zink received, at most, an annual salary of $65,000 that may have been paid directly to Michele Zink. After Fairbrother left the company, he received an average salary of $46,000 per month. Granted, Dennis Zink likely performed additional services with Fairbrother's departure; however, *no* evidence supports a conclusion that the additional services were worth the amount of the challenged transfers.

More to the point, significant evidence indicates the amounts Dennis Zink received bore absolutely *no* relation to the value of the services he provided the company. The overwhelming evidence thus establishes that Mr. Zink did not provide $1,030,241 in services to the company, and rather that the service contracts were merely a subterfuge to take equity out of the company. The alleged amount of "extra" work Dennis Zink performed for the company fails to raise a genuine issue as to whether Mr. Zink's services were reasonably equivalent in value to the extraordinary amount Mr. Zink received. They were not. Accordingly, the reorganized debtor did not receive reasonably equivalent value in exchange for the transfers to Mr. Zink.

The issue then is whether the plaintiff has shown that the company was insolvent, under-capitalized, or not paying debts timely when the challenged transfers were made to Dennis Zink. The Court would find that the plaintiff made no credible effort to establish this factually intensive prong of the constructive fraud test and, as a result, the Court cannot succeed on these points, at least by summary judgment.

The plaintiff, however, *can* successfully rely on a relatively new provision contained in the Bankruptcy Code at §548(a)(1)(B)(ii)(IV), but not yet in the Florida Statute §725.105(1)(b),

to meet the third prong of the constructive fraud test. The new third prong allows a plaintiff to avoid a transfer as constructively fraudulent, irrespective of any insolvency analysis or actual fraudulent intent, if the transfer was "to or for the benefit of an insider…under an employment contract and not in the ordinary course of business."[35] The undisputed facts in this case indicate that Dennis Zink, clearly an insider, certainly received the challenged transfers under the "service contracts" outside of the ordinary course of business.

In response, Dennis Zink argues he was operating as an "independent contractor," not as an employee, when he received the transfers. The defendants argue the facts support this position. The service contracts identify Dennis Zink as a "contractor." Mr. Zink was not on company payroll. The company reported Mr. Zink's compensation to the Internal Revenue Service as independent contractor payments.

The independent contractor label, however, is not conclusive as to whether he had an employment relationship with the company. Under Eleventh Circuit Court of Appeals precedent, courts use a multi-factor test to determine whether a person is an employee or an independent contractor.[36] Pertinent factors include:

> (1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated (i.e., by one or both parties, with or without notice and explanation); (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"; (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties.[37]

---

[35] Bankruptcy Code § 548(a)(1)(B)(ii)(IV).
[36] *Cobb v. Sun Papers, Inc.*, 673 F.2d 337 (11th Cir. 1982).
[37] *Id.* at 340.

"No one factor is controlling, nor is the list exhaustive…. The weight of each factor depends on the light it sheds on the putative employee's dependence on the alleged employer, which in turn depends on the facts in the case."[38]

Despite the fact that the Zinks labeled Dennis Zink as an independent contractor, the Court finds the service agreements in reality were employment agreements for purposes of § 548(a)(1)(B)(ii)(IV). Dennis Zink was the vice president and CEO of the company. He was an insider, not a third party brought in to assist the company with sales after Fairbrother's departure. He was both the "employer" and the "employee" and cannot with any seriousness be considered an *independent* contractor. He signed the very checks from the company paying himself for his alleged "services," and likely determined how the company should report the transfers to the IRS. None of these actions evidence an independent contractor relationship, but instead are further indications of the level of control Dennis Zink had over his own compensation. In other words, these points *underscore* the argument that Mr. Zink had an employment relationship with the company.

Moreover, as explained above, these service contracts were a sham. Their only purpose was to avoid the Zinks' contractual duties to Fairbrother. Mr. Zink's duties with the company remained largely the same, yet his pay increased nearly tenfold. The contracts were clearly outside of the ordinary course of business.

The Zinks next argue plaintiff may not rely on subsection (IV) of § 548(a)(1)(B)(ii) because it did not raise this specific subsection in the complaint as a basis for relief. They cite two cases for the proposition that summary judgment is not appropriate on any matter that is not alleged in the subject complaint.[39] In fact, neither case stands for this proposition. Both merely

---

[38] *Holland v. Gee*, 719 F.Supp.2d 1361, 1365 (M.D. Fla. 2010)(quoting *Santelices v. Cable Wiring*, 147 F.Supp.2d 1313, 1319 (S.D. Fla. 2001)).

[39] *In re Berger, Jr.*, Bankr. No. 05-34196, Adv. No. 05-3214, 2007 WL 2462646, *4 (Bankr. N.D. Ohio); *In re Gustafson*, 381 B.R. 259, 262-63 (Bankr. W.D. Ark. 2008).

state the unsurprising conclusion that when the plaintiff has not alleged or shown *at trial* any evidence to support one of the four subparts in §548(a)(1)(B)(ii), the court must find in favor of the defendant on a constructive fraudulent transfer claim.  Here, however, the reorganized debtor has come forward with copies of the actual service contracts, copies of the checks made out to Dennis Zink pursuant to these contracts, and summary charts of the amounts he received under the contracts.[40]  The Zinks have not disputed the accuracy or legitimacy of *any* of this evidence.

Although the original complaint may not have cited subsection (IV) specifically, the complaint alleged enough to allow the reorganized debtor to rely on subsection (IV) on summary judgment.  The complaint alleges "[t]he conveyances [to Mr. Zink] were made to an insider of the Corporation and concealed from its creditors," and that Mr. Zink received the transfers as alleged "compensation/salary."[41]  Moreover, the complaint alleged the plaintiff was seeking to avoid constructively fraudulent transfers under § 548(a)(1)(B) and comparable Florida Statutes. The motion for summary judgment, in other words, did not spring an entirely new cause of action on the defendants.  The motion merely relies on a specific subsection of the statute plainly pled in the complaint.

Further, the defendants' "surprise" reeks of insincerity given their insider knowledge and manipulation of the events alleged in the complaint.  The defendants could not possibly have been surprised by the plaintiff's reliance on subsection (IV), and, moreover, the Zinks have had ample opportunity to rebut or contest the plaintiff's allegations and exhibits regarding subsection (IV).  They simply have failed to do so persuasively.  Accordingly, as to Count II, the constructive fraud count asserted under §548(b) of the Bankruptcy Code, the Court will grant summary judgment in favor of the plaintiff as to the $1,030,241 received by Dennis Zink, an

---

[40] Doc. No. 22 and exhibits thereto.
[41] Doc. No. 1, ¶¶ 17, 38, 51.

insider, finding that the debtor transferred the monies to him for less than reasonably equivalent value pursuant to an employment contract made outside the ordinary course of business.

The Court, however, will deny the plaintiff's motion for summary as to Count IV, brought under §726.105(1)(b) of the Florida Statutes. Florida's constructive fraud statute mimics the Bankruptcy Code in most respects, but does not include any equivalent to §548(a)(1)(B)(ii)(IV). Given that the Court relies on this specific subsection in entering summary judgment in favor of the plaintiff and that the plaintiff has failed to establish the third prong under the comparable Florida law, i.e, that the debtor was insolvent, under-capitalized, or not paying its bills timely, the Court must deny summary judgment as to Count IV. Similarly, the Court will deny the plaintiff's motion as to any transfers made to *Michele* Zink, insofar as disputed material facts exist as to whether she provided "reasonably equivalent value" for the continued salary she received.

### **The Zinks are not entitled to summary judgment.**

Turning to the Zinks' motion for summary judgment, they contest the plaintiff's ability to bring this lawsuit at all because there is no benefit to the bankruptcy estate. As to only Count V, asserting director liability claims under §607 of the Florida Statutes, the defendants again argue the plaintiff lacks standing and also that the plaintiff failed to retain the right to bring the claim under the Plan and the Confirmation Order.

As to the challenge to the plaintiff's overall standing, the defendants argue that, under the terms of the Plan, only Fairbrother will benefit and not the estate as required under § 550 of the Bankruptcy Code. Section 550 of the Bankruptcy Code authorizes recovery of avoided transfers only if the recovery is "for the benefit of the estate." Here, any recovery in this adversary proceeding would "benefit the estate."

The confirmed Plan describes Fairbrother's Class 8 claim as follows:

> The Trustee does not believe that any amount is owing to Fairbrother and has filed an objection to the claim.[42] Fairbrother's claims consist primarily of allegations that Dennis and Michele Zink caused the Debtor to pay distributions to each of them that have been paid to her. The Trustee intends to pursue fraudulent transfer claims against Dennis and Michele Zink, and the Trustee believes that the estate is the proper party to pursue such claims. As such, the estate and Fairbrother have a competing interest in the claims against the Zinks. At this time, the estate intends to pursue those claims against the Zinks, and the confirmation order shall preserve the right of the estate to pursue those claims. *If the claims are pursued successfully, after payment of the attorneys' fees, costs, and expenses to pursue these claims, and the retention of $125,000.00 by the Company to be used as necessary for the payment of claims [sic] of other claims in the case, the remaining proceeds shall be used to pay the allowed claim, if any, of Faith Fairbrother, until such claim is paid in full.*[43]

Under § 7.02 of the Plan, the reorganized debtor will fund required payments, at least in part, from the litigation proceeds in this adversary proceeding, among other sources. At least one class of creditors, the Class 4 claimant (the Orange County Tax Collector), is entitled to receive monthly payments through February 2014. Although the Court cannot determine if the reorganized debtor instead has "pre-paid" this creditor,[44] the Plan itself provides for payments many months into the future. Thus, it is simply not the case that only Fairbrother will benefit from any recovery in this adversary proceeding because at least $125,000 may be used to make plan payments to other creditors.

Moreover, even if Fairbrother *is* the only creditor to receive a plan payment from any recovery in this adversary proceeding, such potential recovery still provides a benefit to the estate for purposes of § 550. Creditors, including Fairbrother, voted in favor of this plan knowing her right to plan payments is entirely contingent upon the success of this adversary

---

[42] The Trustee's objection (Doc. No. 231) to Fairbrother's claim was withdrawn on February 24, 2009 (Doc. No. 279).

[43] Doc. No. 250, p. 5 (emphasis added).

[44] The debtor's Post-Confirmation Quarterly Operating Report for the period from January 1 to March 31, 2011, indicates the Tax Collector has received $25,723.28 total since the effective date of the plan, on proofs of claim totaling $51,824.05 (Doc. No. 307). The debtor made no payments to the Tax Collector for this latest quarter, however, and the Zinks assert the Tax Collector has been paid in full.

proceeding. In other words, no other creditor's claim was reduced by Fairbrother's claim *because* she agreed to accept a contingent payout. The estate and other creditors therefore benefit, even if indirectly, from this arrangement, and in turn from this adversary proceeding.[45] Accordingly, the Court will deny summary judgment in favor of the Zinks on their overall standing argument, finding that this adversary proceeding potentially provides a benefit to the estate under § 550.

As to Count V, defendants again assert that the plaintiff lacks standing, arguing that the debtor did not retain the right to pursue the director liability claims in the Confirmation Order or in the Plan or Disclosure Statement. The Confirmation Order, however, gives the reorganized debtor the express authority "to pursue any Chapter 5 claim or cause of action."[46] Under § 541 of the Bankruptcy Code, "all legal or equitable interests of the debtor in property as of the commencement of the case" becomes property of the debtor's estate, including a corporation's claims against its officers and directors.[47] Thus, the debtor's state law claim against the Zinks became property of the estate under § 541 and therefore is a Chapter 5 claim or cause of action under the Confirmation Order.[48] The Zinks argument accordingly fails.

The Zinks next argue that § 1125 of the Bankruptcy Code required the debtor to specifically disclose in the Plan or Disclosure Statement the possibility that it might pursue a director liability claim against the Zinks. This argument also fails for two reasons. First, the Bankruptcy Code does *not* require a proposed plan of reorganization to "specifically identify

---

[45] *See Furr's Supermarkets, Inc. v. Conagra Grocery Products Co. et al. (In re Furr's Supermarkets, Inc.)*, 373 B.R. 691, 699-700 (10th Cir. BAP 2007) (holding "benefit of the estate" is a broadly interpreted standard that may be met even when no unsecured creditor receives payment as a result of a recovery action); *see also* 5 Collier on Bankruptcy ¶ 550.02[2] at 550–7 (Alan N. Resnick & Henry J. Sommer eds. 16th ed. rev. 2010) ("If the recovery will have some positive benefit to the estate or its creditors, however, recovery may be had even if such benefit is indirect.").

[46] Case No. 09-bk-02071, Doc. No. 265 at 10, ¶25.

[47] *In re Caribbean K. Line, Ltd.*, 288 B.R. 908, 914-15 (S.D. Fla. 2002); *Delgado Oil Co. v. Torres*, 785 F.2d 857, 860 (9th Cir. 1986).

[48] The Zinks mistakenly assume Count V is brought pursuant to § 544 and argue that statute authorizes only avoidance of transfers or obligations by the debtor, not state law causes of action for breach of fiduciary duty. Claims against officers and directors of a debtor corporation are property of the estate under § 541.

each and every claim or interest belonging to the debtor that may be subject to retention and enforcement."[49] Section 1123(b)(3) states a plan *may* provide for: "(A) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; or (B) the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest." Here, as discussed above, the confirmed Plan did in fact disclose the possibility of this very adversary proceeding in discussing the payment of Fairbrother's claim in Class 8.[50] Moreover, the Confirmation Order specifically allows the debtor to pursue any Chapter 5 claim, which includes the debtor's state court claims against the Zinks. Thus, the Plan adequately disclosed the possibility of this adversary proceeding.

The Zinks' argument wrongly assumes the Bankruptcy Code is concerned with providing notice to *defendants* of potential law suits, rather than providing adequate information to *creditors*. The purpose of the disclosure requirements in §§ 1123 and 1125 is to allow creditors to cast an informed vote for or against a plan of reorganization. As one court has stated, "[c]reditors have the right to know of any potential causes of action that might enlarge the estate—and that could be used to increase payment to the creditors."[51] Likewise, creditors have the right to know whether the debtor intends to pursue causes of action against *them* post-confirmation. The Zinks, however, were not creditors in this bankruptcy case. Their objection to the adequacy of the disclosures in the debtor's Plan and Disclosure Statement thus rings hollow because they, as defendants to an action retained by the debtor, are not the intended beneficiaries of the Code's disclosure requirements; and, in any event, the Plan and Disclosure

---

[49] *In re USN Communications*, 280 B.R. 573, 589 (Bankr. D. Del. 2002).
[50] Doc. No. 250, p. 5.
[51] *Harstad v. First American Bank 39 F.3d 898* (8th Cir. 1994); *see also Enron Corp. v. New Power Co. (In re New Power Co.)*, 438 F.3d 1113, 1118 (11th Cir. 2006).

Statement *did* adequately disclose the possibility of a lawsuit against them.[52] The Court accordingly denies summary judgment in favor of the Zinks on this argument.

In summary, the Court grants partial summary judgment in favor of the reorganized debtor on Counts I, II, and III as to the transfer made to Dennis Zink in the amount of $1,030,241. The plaintiff's motion for summary judgment[53] is otherwise denied, specifically as to any transfers received by Michele Zink, and any relief sought under the Florida constructive fraud theory under Count IV. Defendants' motion for summary judgment or, in the alternative, partial summary judgment on Count V,[54] is denied *in toto*. A separate order consistent with this memorandum opinion shall be entered simultaneously.

DONE AND ORDERED in Orlando, Florida, on July 19, 2011.

KAREN S. JENNEMANN
United States Bankruptcy Judge

Copies provided to:

Counsel for the Plaintiff: Bradley M. Saxton, Winderweedle, Haines, Ward & Woodman PA, 390 N. Orange Avenue, Suite 1500, Orlando, FL 32801

Counsel for the Defendants: Esther A. McKean, Akerman Senterfitt, PO Box 231, Orlando, FL 32802

---

[52] The Court also notes that the debtor's director liability suit and its fraudulent transfer causes of action derive from the same alleged misconduct on the part of the Zinks. Thus, the plan provisions regarding the debtor's intent to bring fraudulent transfer claims against the Zinks put them on notice of the possibility of other claims derived from the same set of facts.

[53] Doc. No. 22.

[54] Doc. No. 35.